23-4117. May it please the court, Jake Rochebeau for the appellant, Mr. Maryboy. Two errors prevented the jury from properly considering whether Mr. Maryboy lacked the mens rea for second-degree murder. First, a government expert testified that Mr. Maryboy's conduct was the ultimate expression of recklessness, which violated Rule 704B. And second, the instructions failed to inform the jury that the government had the burden to prove beyond a reasonable doubt that Mr. Maryboy did not subjectively believe he was acting in self-defense, and in fact erroneously told the jury it could convict him of second-degree murder even if he subjectively believed he was acting in self-defense. Given that mens rea was the only disputed element at trial, both errors independently warrant reversal. Under Rule 704B, an expert cannot expressly draw the conclusion that a defendant acted with the necessary mens rea. Here, Agent Olson repeatedly opined that Mr. Maryboy's conduct was reckless, gross, negligent, reckless, even the ultimate expression of recklessness. This clearly violated the rule. Wood makes this absolutely clear. There, a government expert testified that the defendant's conduct or his actions were reckless because they were fraught with the perils of causing death. This court recognized that although his testimony was not cast in precisely the same terminology as the statute, case law, or instructions, they still recited the critical components they identify and therefore violated Rule 704B. The exact same thing happened here. Agent Olson testified that he was reckless, gross, negligent, reckless, and the ultimate expression of recklessness, and this is materially indistinguishable from the definition of extreme recklessness, malice, that the jury received in the instructions. The only distinction between this case and Wood would be that in Wood, the government expert specifically testified that the defendant's conduct was reckless, whereas here, the government asked the expert a series of hypotheticals, but this court's precedent in Denison and other cases and the Supreme Court recently in Diaz confirmed that experts cannot circumvent Rule 704B answering questions about hypotheticals unless they actually qualify their responses by saying most defendants in this situation would have this mens rea. Here, Agent Olson did not qualify his testimony in any way and therefore expressly drew the conclusion for the jury that Mr. Maryboy's conduct was extremely reckless. Counsel, can we go backwards a little bit to talk about preservation and whether or not the objection as to form, I believe is the objection that was made, preserved this issue sufficiently so that we look at it for abuse of discretion versus plain error? Can you help me understand your argument as to what standard review we would apply? Sure. I understand that the form of the question is not a specific objection. I think there's an argument that based on context, the district court understood what he was objecting to, because that's the only thing that he could be objecting to. And when he later objected to the government's question about how does this compare to extreme recklessness, that was objected to again as to the form of the question and the district court sustained that. So I think that shows that the district court understood what the substance of the objection was. But I also think, and I've addressed plain error proactively in my briefs, because I think this court's precedent in Wood and Dennison and the Supreme Court's recent decision in Diaz make this error absolutely plain. So under either standard of review, I don't think this court really needs to decide which standard review applies, because we can prevail under both. Now, the government's main argument is that this issue has been waived because defense counsel conceded recklessness and abandoned the misfired warning shot theory of defense. This is incorrect both factually and legally. Factually, the defense counsel did not abandon this theory at all. In fact, in closing argument, he specifically argued, quote, they were warning shots, not reckless. Therefore, he did not concede that the actions were reckless or abandoned the misfired warning shot theory. But even if he had, that's just not how a waiver works. The theory of the defense that the defense pursued has nothing to do with whether they affirmatively abandoned or waived an evidentiary issue. The government also argues that there was no violation because recklessness is not the mens rea. Malice is. But Wood is directly on point there. It doesn't have to testify. The expert doesn't have to testify directly to the mens rea as defined in the statute. He just has to recite the critical components, which he clearly did here. The government also argues that the statements are unclear, that he might not be talking about Mary Boy's specific conduct. Ultimate expression could be of recklessness could just mean it was a great example or the best possible example of ordinary recklessness or that he meant those terms in the colloquial sense. But we know that's not true because he was he was responding to the question, how reckless was that act? So he's clearly talking about the degree of recklessness. And when he says the degree of recklessness was the ultimate expression of recklessness, clearly he's saying that it is that this conduct is extreme, but not more than extremely reckless. It is the ultimate of recklessness. And even if he was trying to use colloquial language, there's no way the jury would have known that. And it's clearly not how the parties understood it at the time. Because You both remind me of the specific testimony. You think the question makes it clear that the witness was referring specifically to the defendants being reckless. Is that right? Right. Would you read the question and what the response was? Do you have that in? Read the question. The question was how reckless was that act? So he had. Yeah. So he had just so the way that the in the objectionable testimony occurred both on direct and on redirect direct examination, he posed three hypotheticals. One was if somebody had this firearm, because this was the firearms expert. So he testified that if you if somebody had pointed the firearm directly at this person and fired, would that be would that be consistent with with or somebody pointed them. The first two hypotheticals are one if you had raised it at like a 45 degree angle. The first questions were clearly hypothetical, not necessarily. Yeah. And then the third hypothetical was please refer to Rachel Green's diagram that she has provided here. And now I'm going to add 10 to 12 new facts to this hypothetical. And then all based on Rachel Green's testimony. And then on redirect, he changed the hypothetical to if he had fired intended to fire a warning shot as he's raising the firearm, it went off while it was pointed at. Did the expert say that was reckless or that would have been reckless? Which what was the language used? I think it's the exact language. He is suggests the very particular concern with what precise words were used, it seems to me. Right. So he says how reckless is that act? So the government is specifically referring to the act the question and the answer was that act was or that act would be that is the ultimate expression of recklessness. You just use the term reckless. So first he referred to recklessness. Then the government says you just use the term reckless. That scenario that we just went through, how reckless is that act? And then the witness says anytime you handle a weapon in an unsafe manner, it could take another human life. And so to me, that's the ultimate expression of recklessness. So he's asking how reckless was that conduct? And the answer is that was the ultimate expression of recklessness because it can take a human life. So he's not qualifying it by saying, well, most, I would say most defendants in that situation would probably be acting recklessly. And that's what it was in Diaz. As long as you're just saying, you know, that's the blind mule case where as long as you're saying, well, most defendants in this scenario probably know that there are, that the drugs are in the car. That is okay because you're not telling the jury that it has to draw or that, that they are, it's not drawing the conclusion for the jury that this specific defendant was. But if you don't qualify and you just say this hypothetical defendant was acting recklessly, then you're saying every person in that, in the defendant's shoes are acting recklessly. And that's what's Counsel, let's assume that we were to conclude there is a 704 B violation. Help me understand your argument as to why that would merit reversal. When the context of this case is maybe that Olson's testimony was regarding extreme recklessness, but at the end of the day, the victim was shot in the back of the head. So how do we balance the testimony of Olson and that error with the, what seems to be pretty strong evidence for the about the forensics of him being shot in the back of the head, but also the blood spatter showing that it was, he was standing with an open door to his van. So I agree that the evidence is, the physical evidence is overwhelming that he died near the van and was shot in the back right side of the head. But that's, you know, circumstantial evidence of intent, but it's not inconsistent in any way with Mr. Maryboy's defense, which was that I was intending to fire a warning shot and it must've gone off prematurely as I was raising the firearm. Unfortunate, certainly, and perhaps unlikely the, how, you know, to actually hit them in the head, but it's not inconsistent at all. The physical evidence doesn't contradict Mr. Maryboy's defense in any way. What would be the need for a second warning shot? If the deceased is facing away from you, how many warning shots does he get? I'm not sure. I don't know that there's any sort of, you know, I'm not aware that we can say that one warning shot is reasonable. A second warning shot is unreasonable. You know, perhaps the logic at the time was to, you know, show him that he really did mean it, that it wasn't like a hollow gesture or something. I'm not really sure, but I don't know that we can read too much into, you know, the government's argument at trial was, well, if the first one didn't work, why would you fire a second one? I think, you know, it was an extremely tense moment and the argument, the alternative argument below in the argument on appeal now is not that he took a reasonable course of action, just that he did what he did because he subjectively was in fear and thought that this was subjectively was acting in self-defense in the moment. The testimony was also prejudicial because mens rea was the only disputed element, as I've mentioned. The law enforcement expert testimony is extremely persuasive to jurors, and this court has said that. The mens rea between second-degree murder and involuntary manslaughter is, the difference between those two is an extremely fine line. It just exists on a spectrum, so it's likely that his testimony was exactly what the jury needed to push the line from regular recklessness to extreme recklessness. I see I'm running low on time, so I would like to touch on the instructional error, too, very briefly. So the second issue is that it was plain error not to instruct the jury that the government had the burden to prove beyond a reasonable doubt that Mr. Marenboi did not subjectively believe he was acting in self-defense, and it also erroneously instructed the jury that it could convict him of second-degree murder even if he acted in, subjectively acted in self-defense, and those are plainly erroneous. Haven't we recently said that failure to give such an instruction when it's not requested is not plain error? Yes, Your Honor, if you're referring to Sago, and that, Howard, you may disagree with Sago. I think we're stuck with it. How do you distinguish it? Because Sago, you know, as Your Honor well knows, is there was no request for an imperfect self-defense instruction, self-defense instruction at all, and there was no lesser included offense instruction given. So Your Honor's main point there was that a district court's honor and obligation to sua sponte provide this theory of the defense instruction when it wasn't requested and there is no involuntary manslaughter instruction given, but here the lesser included offense, the involuntary manslaughter was given. The elements of imperfect self-defense were provided to the jury in the instructions. The only thing that's missing is the government's burden to Loftin. I think that's a reasonable distinction from Sago, but is it plain? Is that obvious that that distinguishes Sago so the second element of plain error is satisfied here? Yes, Your Honor, because this case is indistinguishable from Loftin. Loftin, the only difference there is, which I don't think is material, is that Loftin was a heat of passion defense, and here we're talking about imperfect self-defense. There the jury was instructed on the elements of a heat of passion defense, but those elements appeared only in the involuntary manslaughter instruction, and that's exactly what we have here. This court said that that's not enough. You have to instruct. It's plain error not to instruct the jury that it's the government's burden to disprove heat of passion, and compounding the we have here is that the structure of the instructions was such that the jury was never going to get to involuntary manslaughter to find the elements because they had to consider second degree murder first. I would like to preserve 15 seconds of time for rebuttal. Sorry. Thanks. May it please the court, Nathan Jack for the United States. Mary Boy killed Montwine. A trial for second degree murder, the jury heard two accounts. One from Ms. Green of a shot to the back of Mr. Montwine's head as he stood at the van door after having walked away. The other from Mr. Mary Boy of an accidental misfired warning shot as the two stood face to face across the truck bed. The evidence thoroughly corroborated Ms. Green's account. Mr. Mary Boy's account, on the other hand, was so incompatible with the evidence that trial counsel was forced to abandon key aspects of his testimony below. Now on appeal, Mr. Mary Boy asked his court to reverse his convictions based on two issues he did not raise below and on theories that he discarded. He cannot satisfy plain error on either one. His 704B claim fails for three reasons. First, recklessness was not at issue as trial counsel abandoned key facts from Mr. Mary Boy's testimony and conceded recklessness to the jury during closing argument. How was that? How do you say he conceded that when the defendant said I didn't mean to kill him when I shot? And then the issue is was he reckless? Yes, go ahead. So I encourage, if this court hasn't, to read defense counsel's closing arguments in the full to really get a sense of what the argument was. And we see around 1817, 1818 in the record, that the defense counsel concedes, yes, Mr. Mary Boy knew what the rules of gun safety were, but he ignored those rules of gun safety because he feared for his life. That's textbook ordinary recklessness, consciously disregarding a known risk. He told the jury that Mr. Mary Boy consciously disregarded the known risk of the gun safety rules because he feared for his life. Okay, you seem to be making the instructional error more consequential when you approach it that way. If I could clarify, there's use of reckless here and many different senses. And my friend said that the difference between reckless and malice is a fine line. But I direct this court to its decision in Kepler and also the Eighth Circuit's opinion in Janus, which this court agreed with in Kepler, when it says that malice of forethought is close to knowledge and a far cry from reckless. And I think the best evidence, this goes to whether the error was plain here, the best evidence that is not clear or obvious that this was an error is in the jury instruction itself, where the court defined for the jury malice of forethought in three ways, each of which requires a consciously directed use of force against a person. That it was deliberate. Yeah, but the instructions also, as I recall, on the murder too, and the definition of malice of forethought says wanton and reckless. And then the lesser included instruction on the voluntary manslaughter also says wanton and reckless. But then, correct me if I'm wrong on this, but the definition then goes on to distinguish the difference between malice of forethought and wanton and reckless in the lesser included, in that it says for malice of forethought it must be recklessness. So isn't that word kind of key here as it relates to the evidence itself? Because, you know, probably no accident, Agent Olson says that is extreme recklessness. Isn't that sort of zeroing in on the distinction between the lesser included and the murder too? So Agent Olson never testified that it was extreme recklessness. Again, the prosecutor attempted to follow up, well, how would you compare that statement with the treatment there? The objection was sustained. But again, going back to the instructions, so yes, we get into that. But again, first, we define malice of forethought in three ways that require the consciously directed use of force against a person. Agent Olson, so that is a critical component of malice of forethought. Agent Olson never testified of that critical component. Then we get to the language of, it may be established by evidence of conduct that is reckless and wanton, a gross deviation from standard of care. But again, that itself is not the final conclusion. What matters is of such a nature that it can be reasonably inferred that the defendant was aware of a serious risk of death or serious bodily harm. So that's the final conclusion. Again, this use of consciously directed use of force. So even if Agent Olson's testimony could be cast in the same language as this reckless and wanton gross deviation language, which I don't think it does, that still is not the final conclusion. As the jury instructions state, it is up to the jury. It's important to you because under the rule of evidence, it's only the final conclusion that the witnesses can. Exactly. Diaz reiterates that it is only when the expert testifies that the defendant held the final conclusion of the mental state. And the jury says, or sorry, the instruction specifically says, the jury, even if that language matches, which it doesn't, it is still up to the jury to infer the defendant was aware of the risk of death. And you're also saying, as I understand, with respect to the third problem of plain error, that, or maybe you're saying this with respect to harmless error, that defense counsel in closing argument acknowledged it was reckless, which is no more than what the expert said. Correct. Correct. So with or without Agent Olson's testimony, the result here would be unchanged. The prosecutor argued throughout trial that the evidence showed a deliberate shot. Mary Boy shot Mr. Montawine in the back of the head after he'd walked away. That is a deliberate shot. Counsel, so what do you make of this language where Olson said it was at least cavalier, if not gross, grossly negligent, reckless to the point, to point a loaded weapon at another person? That's testimony, not a sustained objection. Correct. There's no objection there. And in that testimony, he's not even saying that it is, in fact, grossly negligent. He says it's cavalier, if not grossly negligent, reckless, but again, this is where he's talking about it in more of a colloquial sense. If you look at what he's actually talking about, he's talking about someone who is failing to follow a standard of care. What matters for Malice Before Thought is a consciously directed use of force against a person, and Agent Olson never testified to that critical component. Well, he also said, I know you, I think, corrected me to say he didn't testify about extreme recklessness, but he did say the ultimate expression of recklessness. So that seems to be extreme recklessness, because if it's the ultimate, there's no degree of recklessness above it. So, I mean, I think you hear us struggling a little bit with trying to square your argument with saying, well, he's not really testifying about the element of mens rea because there are more components to Malice Before Thought. But is it sufficient if he hits one of them? Again, we're on planar here, so the question is, is it clear or obvious? And again, no, because if there are several things that are required for Malice Before Thought, one of them being the use of consciously directed force against a person, and Agent Olson never testifies about that, then he never gives the final conclusion of what Mary Boy's mental state was. I was also going to ask you about your argument about the closing argument of counsel relinquishing or abandoning the theory of defense. And I think Judge Hartz asked this, but how do we get to abandonment through closing argument when the evidence of the defendant himself differed maybe from what was argued? I mean, I think in your brief, you cited cases that talked about you can't raise new issues on appeal if they're abandoned below, but not specific to this scenario. So do you have any cases that tell us in closing argument what counsel says can abandon a theory that the defendant testified to? I mean, I think whether we call it waiver or whether we call it lack of prejudice, it's the same argument, essentially, in that recklessness was really taken out of dispute by abandoning the only theory on which recklessness mattered, which was Mary Boy's account of a face-to-face shooting across the truck. And my friend says, oh, well, it's not inconsistent with a misfired warning defense, but it is inconsistent with Mary Boy's testimony. And that was the only theory of the misfired warning shot that the jury heard. So in other words, you're saying even if we don't conclude it was abandoned, it diminishes the prejudice that may have been suffered in the plain air analysis. Exactly. By counsel's taking recklessness out of dispute, it essentially made Agent Olson's use of the word reckless completely meaningless. Or perhaps, even if it doesn't do that, it shows that defense counsel thought they really didn't have any defense on the recklessness aspect. Exactly. Exactly. And that's why I encourage this court to reclose arguments where you see that's why there's this pivot to self-defense. And that really became the focal point. The instruction all the more important. So why don't you address the instruction? Yes. On the imperfect self-defense instruction, again, we have three reasons why Mary Boy fails plain air review here. First, it was not requested. Second, he was not untitled to it. And third, again, we have a lack of prejudice here. So as this court pointed out in Sago... Well, I think he distinguished Sago. But not plainly. And also, I think that the key difference here or the key point here is that an affirmative defense is a strategic decision. And that's why this court... That was important in Sago. It's hard to see how it's a strategic decision when the lesser included offense instruction is given. Because the tactical reason for not going into that issue is you want an all or none verdict from the jury. You've already got the intermediate. That's true. But I think given that even my friend recognizes the unreasonableness of whatever alleged belief that he had, there's an argument to be made that including an imperfect self-defense just draws attention to that. And so you could see a reason why he may want to omit that altogether. But regardless, we're on plain error here. And so the question is, is it clear or obvious that Mr. Mariboy was entitled to an imperfect self-defense instruction? And the answer to that is no. We have no threatening gestures. We have no... You know, I again point to how this court described it in Sago. Recall there was no evidence that the victim was about to use deadly force against Mr. Sago. We have that here. What about the show me your hands part? So again, that doesn't mean that there was any threatening gesture that he was armed. And in fact, after he fired the first warning shot, again, Mr. Mariboy admitted, yeah, if he had a firearm, I would have expected that he would have shown it by then. So, but even in Sago, the defendant testified, I thought that he was armed. That's why I fired. And still, that wasn't enough. Why couldn't we conclude that the circumstances themselves were threatening to Mr. Mariboy when he's just pulled over on the side of the road and all of a sudden this truck pulls up and a guy you know, we know from later evidence that the victim was extremely intoxicated. So, you know, one could assume he presented that way. Why weren't those circumstances threatening in and of themselves to Mr. Mariboy? The circumstance that we have here is a shot to the back of the head from some distance away after Mr. Montoyne had walked away. That's the circumstances. And in case after case, which we notice in our brief, a shot to the back of the head under... He's not entitled in instruction because there were essentially no threat to him at all. There's no evidence that he felt imperiled. And but I guess I'm asking, why can't we conclude that there is evidence there? And ultimately, I get your argument as to maybe why that defense would fail, but we're talking about whether he's entitled to the instruction. Yes, I think those circumstances are not enough again, because there's no evidence that Mr. Montoyne was about to use physical force such that Mr. Mariboy had to resort to shooting him. So again, I turn this court's attention to Krogost, in which the defendant testified that his girlfriend was headbutting him and grabbing knives and reaching for a gun, and there was a physical struggle. And despite all that, the court still found that he was not entitled to an imperfect self-defense instruction because... Didn't the party stipulate one? Sorry, what was that? The party stipulate to an imperfect self-defense instruction, and the district court remodified them? So we do... So there was an initial set of joint stipulated instructions, and in there... Included that. It included imperfect self-defense, but the government was clear that it believed that there wasn't going to be evidence of it. So it was to be given if there was evidence. But then we have the district court coming back. There was a mistrial on that one because of COVID. The district court had come back with its own set of instructions, and said, these are what we're working from, and we have no objection there. No request for imperfect self-defense in that one. But again, turning back to Krogost, the court found one significant hurdle for Krogost is the undisputed forensic evidence that the victim was shot in the back of the head from some distance away. Stands in stark contrast to his claim of how the gun was discharged. And so because of that, there was no entitlement to imperfect self-defense. And again, even if there were, Mr. Montemarie shot in the back of the head from some distance away. So there is no prejudice here, as multiple cases have found. I ask this court to affirm. I try to make two points. First, this idea that the jury would have to make this additional finding about consciously directed force at the victim. That's based on case law, not the actual instructions. The actual instructions distinguish the two different men's ways by saying that second degree murder has to be recklessness that is extreme in nature. And that's all it says to distinguish the two. I realize that I'm out of time. If the court has any further questions. You wouldn't make two points? You wouldn't make the second one? Or did you just make two? No, I didn't make the second one. I would love to. So the case that the government is relying on about the shot to the back of the head that weren't even entitled to instructions, that's an out-of-circuit case that's contrary to this court's precedent about whether you're entitled to instructions, as I explained in the reply brief. And to distinguish to go once more, where this court found that there was no prejudice, that was in large part because the jury found that he was guilty of premeditated murder, which necessarily meant they rejected the defendant's actual theory of defense, which is that it wasn't premeditated because I feared for my life. So they clearly rejected any imperfect self-defense. Thank you, Your Honors. Thank you, counsel. Case submitted. Counsel excused.